Stephen M. Kernan, State Bar No. 181747
THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
Telephone: (310) 490-9777
Facsimile: (310) 861-0503

Attorney for Plaintiff
DEBORAH SLATZER

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| DEBORAH SLATZER, an individual, | Case No. |
| Plaintiff, | **COMPLAINT FOR:** |
| vs. | **(1) COPYRIGHT INFRINGMENT IN VIOLATION OF 17 U.S.C. §§ 101 *ET SEQ.*** |
| NATIONAL BOOK NETWORK, a corporation; TURNAROUND PUBLISHER SERVICES, a corporation; BLOOD MOON PRODUCTIONS, a corporation; and DOES 1-25, | |
| Defendants. | **DEMAND FOR JURY TRIAL** |

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

Plaintiff Deborah Slatzer for her cause of action against Defendants National Book Network, Turnaround Publisher Services, and Blood Moon Productions (collectively, "Defendants"), and each of them, alleges as follows:

### JURISDICTION AND VENUE

1.      This is a civil action against Defendants for their acts of copyright infringement in violation of the United States Copyright Act, 17 U.S.C. §§ 101 et seq. This Court has original jurisdiction over the copyright infringement under 28 U.S.C. §1331 and § 1338.

2.      Venue is proper in this District under 28 U.S.C. §§ 1391 (b) and (c) and 28 U.S.C.§ 1400(a) in that the claim arises in this Judicial District, and that the Defendants may be found and/or transact business in this Judicial District, and  the injury suffered by Plaintiff took place in this Judicial District. Defendants are subject to the general and specific personal jurisdiction of this Court because of their contracts with the State of California.

### PARTIES

3.       Plaintiff Deborah Slatzer is an individual residing the County of Los Angeles, California.

4.       National Book Network is a corporation of unknown origin but at all times relevant doing business in this district and in the County of Los Angeles, State of California.

5.       Turnaround Publisher Services is a corporation of unknown origin but at all times relevant doing business in this district and in the County of Los Angeles, State of California.

6.       Blood Moon Productions is a corporation of unknown origin but at all times relevant doing business in this district and in the County of Los Angeles, State of California.

7.       The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants Does 1 through 25, inclusive, are unknown to Plaintiff, and Plaintiff therefore sued said Defendants by such fictitious names. Plaintiff will amend this Complaint to show the true names and capacities when they have been ascertained.

**COMPLAINT**

8.      Plaintiff is informed and believes, and on that basis alleges, that each of the Defendants named herein as Doe is in some way responsible for the acts and events alleged herein.

9.      Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned herein, Defendants, including Doe Defendants, and each of them, were the agents, servants, employees, representatives, partners, subsidiaries, affiliates, joint venturers or alter-egos of each other, and in doing the things herein alleged, were acting within the full course and scope  of such relationship, and with the full knowledge, authorization, consent and ratification, either express or implied, of each of the other Defendants.

### STATEMENT OF FACTS

10.      Plaintiff Deborah Slatzer is the owner of several **photographs** ("Photographs") taken by her late husband on commission by him. Plaintiff owns and continues to own all rights in and to the **Photographs** including the copyrights thereto.

11.      On information and belief, Defendants created, published, and **distributed a book** ("Infringing Publication"), as set forth above, centered around the life of Monroe. Despite no permission, consent, or license to do so, Defendants made identical copies of the **Photographs** ("Infringing Images") and included them within the pages of the Infringing Publication. True and correct copies of the Infringing Images are attached.

12.      On information and belief, on or about Junes 2012, Defendants released the Infringing Publication for sale throughout the United States, including and within the state of California. Defendants continue to offer this Infringing Publication for sale, including through their own websites and through the websites of third-parties.

13.      Plaintiff Deborah Slatzer, is the owner of copyright in numerous photos taken by her late husband, Robert Slatzer (the "Works").  All of the Works were taken by him, or were a work made for hire at his request.

14.      As the copyright owner of all of these photographs, Plaintiff has several exclusive rights under The Copyright Act 1976. These exclusive rights include the right to reproduce the Works (17 U.S.C. § 106(1)), and to publish and distribute the Works to the

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

3

**COMPLAINT**

public, including by way of sale (17 U.S.C. §§ 106(3)). It is an infringement of copyright to do any of the acts comprised in the copyright in relation to the whole or a substantial part of the Works, or to authorize such an act, without the permission or license of the copyright owner. In other words, as you may know, use of an image without a valid license is considered copyright infringement in violation of U.S. Copyright Law.

15.     Attached hereto as Exhibit "A" and incorporated herein as though fully set forth is a demand letter sent to the defendants in this action.  Defendants refused to comply with the terms of the demand letter and this lawsuit followed.

16.     Defendant has ignored these warnings despite that the fact that their book infringed four separate photographs in their book, entitled "Marilyn At Rainbow's End: Sex, Lies, Murder, and the Great Cover-up," published on June 16, 2012, by Blood Moon Productions and distributed by National Book Network and Turnaround Publisher Services. Namely, the infringements consisted of:

- On page 51 of the book: A black and white photograph of the actress Jeanne Carmen. Plaintiff's copyright registration has been filed and approved.

- On page 215 of the book: A black and white photograph of Robert Slatzer and Marilyn Monroe. Plaintiff's copyright registration has been filed and approved.

- On page 222 of the book: A black and white photograph of Paula Strasberg. This photograph was registered with the U.S. Copyright office in 1990.

- On page 269 of the book: A black and white photograph of Peter Lawford's Beach estate house in Santa Monica. Plaintiff's copyright registration has been filed and approved.

17.     Copies of the aforementioned infringements are attached to the demand letter attached as Exhibit "A" and incorporated into this complaint. Defendants failed to seek permission or a license from the owner of copyright in these photographs to use them in their

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

book, the conduct described above constitutes infringement of Plaintiff's copyright, and in fact, willful infringement.

18.     Plaintiff served notice to National Book Network to cease and desist from using the Infringing Images in the Infringing Publication. A copy of the aforementioned notice is attached as Exhibit "B" and incorporated into this Complaint.

### FIRST CAUSE OF ACTION

### (Copyright Infringement)

### Against All Defendants

19.     Plaintiff repeats and adopts paragraphs 1 through 18, inclusive, of this Complaint as though fully set forth herein.

20.     This cause of action for copyright infringement arises under the copyright laws of the United States. U.S.C. 17 § 101, *et seq*.

21.     Plaintiff owns all rights, titles, and interest in and to the Photographs, which were created by Plaintiff.

22.     The Photographs are original works and thus protected under United States copyright law.

23.     Plaintiff registered the copyright rights in and to the Photographs, as evidenced by the attachments hereto.

24.     On information and belief, Defendants had access to the Photographs.

25.     In violation of Plaintiff's copyrights in and to the Photographs, Defendants have without Plaintiff's consent, approval or license, copied, printed, published, displayed, transmitted, distributed, and otherwise, used the Infringing Images in connection with the Infringing Publication.

26.     The Infringing Images are substantially similar—if not identical—to the Photographs.

27.     Upon information and belief, the Infringing Images, and the Infringing Publication in which they appear, constitute an infringement of the Photographs.

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

**COMPLAINT**

28.     Upon information and belief, Defendants are in possession of the Infringing Publication, which incorporates the Infringing Images, and continues to distribute said Infringing Publication throughout the United States.

29.     Upon information and belief, Defendants use of the Infringing Images in connection with the Infringing Publication has been willful and deliberate.

30.     Upon information and belief, Defendants continue to infringe Plaintiff's copyright rights in the Photographs.

31.     Defendants' infringement of Plaintiff's copyright rights has yielded Defendants profits in an amount yet determined.

32.     Plaintiff believes that he has suffered or is likely to suffer damages and will continue to suffer serious and substantial damages resulting from Defendants' copyright infringement, including irreparable injury for which there is no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1. That the court finds that Defendants infringed Plaintiff's copyright rights in the Photographs;

2. For a preliminary and permanent injunction restraining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise from doing, abiding, causing, or abetting any of the following:

a. Directly or indirectly infringing Plaintiff's copyright rights in the Photographs;

b. Filing and/or taking any further orders for the Infringing Publication up to and including the date of the final resolution of this action; and

c. Using Plaintiff's copyright rights in the Photographs in the selling, offering for sale, promoting, advertising, marketing, and distributing of the Infringing Publication or any other publication.

3. That Defendants be required to account for any pay to Plaintiff all of the profits obtained by Defendants from their infringing acts;

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

COMPLAINT

4. That Defendants be required to pay Plaintiff such damages as Plaintiff sustained in consequence of Defendants' copyright infringement, including but not limited to Plaintiff's actual or statutory damages and attorney's fees;

5. That Defendants be required to deliver Plaintiff for destruction all copies of the Infringing Publication in their possession or under their control, and take all necessary and appropriate steps to recall for destruction all copies of the Infringing Publication from its suppliers, printers, distributors, and retailers;

6. That Plaintiff be awarded compensatory damages

7. That Plaintiff be awarded punitive damages for the willful and wanton acts of copyright infringement;

8. That Plaintiff be awarded its reasonable attorney's fees and costs of this action;

9. The Plaintiff be awarded any such other and further relief as the Court may deem just and appropriate.

DATED: April 30, 2015                         THE KERNAN LAW FIRM


By: _/s/ Stephen M. Kernan_____
      Stephen M. Kernan
      Attorney for Plaintiff
      Deborah Slatzer

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

**COMPLAINT**

# Exhibit "A"

# THE KERNAN LAW FIRM

9663 Santa Monica Blvd. Suite 450
Beverly Hills, CA 90210

Stephen M. Kernan, Esq.
Direct: (310) 490-9777
Facsimile: (310) 861-0503
mkernan@kernanlaw.net

Adjunct Professor of
Entertainment Law
University of California,
Hastings College of Law

March 22, 2015

**<u>VIA U.S. MAIL AND EMAIL</u>**

Darwin Porter
c/o Blood Moon Productions
75 Saint Marks Place
Staten Island, New York 10301-1606
Phone: (718) 556-9410
Email: editors@bloodmoonproductions.com

Blood Moon Productions
75 Saint Marks Place
Staten Island, New York 10301-1606
Phone: (718) 556-9410
Email: danforthprince@bloodmoonproductions.com

National Book Network
4501 Forbes Blvd., Suite 200
Lanham, MD 20706
Phone: (301) 459-3366
Fax: (301) 429-5746
Email: customercare@nbnbooks.com

Turnaround Publisher Services
Unit 3, Olympia Trading Estate
Coburg Road, Wood Green
London, UK
Email: customercare@turnaround-uk.com

   Re:  <u>Copyright Infringement in "Marilyn at Rainbow's End"</u>

Dear Mr. Porter:

   My client, Deborah Slatzer, is the owner of copyright in numerous photos taken by her late husband, Robert Slatzer (the "Works").

   The sole photograph that was not taken by Mr. Slatzer's late husband was a work for hire owned by him and duly transformed to Ms. Slatzer upon his death. 17 U.S.C.A. § 201. *See* 328 F.3d 1136 <u>Warren v. Fox Family Worldwide, Inc.</u>, 328 F.3d 1136 (9th Cir. 2003); <u>JustMed, Inc. v. Byce</u>, 600 F.3d 1118, 1128 (9th Cir. 2010) (finding that a computer software rightfully

1

belonged to a technology company rather than the computer programmer who developed the software, because it was a work made for hire by the programmer). Here, there is no question that the sole photograph not taken by the decedent was a work for hire.

As the copyright owner of all of these photographs, my client has several exclusive rights under The Copyright Act 1976. These exclusive rights include the right to reproduce the Works (17 U.S.C. § 106(1)), and to publish and distribute the Works to the public, including by way of sale (17 U.S.C. §§ 106(3)). It is an infringement of copyright to do any of the acts comprised in the copyright in relation to the whole or a substantial part of the Works, or to authorize such an act, without the permission or license of the copyright owner. In other words, as you may know, use of an image without a valid license is considered copyright infringement in violation of U.S. Copyright Law.

A case in point is Greenwich Workshop, Inc. v. Timber Creations, Inc., 932 F. Supp. 1210 (1996), in which a defendant similarly situated to you engaged in a practice of cutting out the bookplates of the plaintiff's book, transposing them onto canvas, framing them, and selling the end product. The plaintiff—who was the copyright owner of the book and the images used by the defendant—sued because the defendant did not have permission to use the images. The court determined that the defendant's use of the matted and framed bookplates infringed the plaintiff's copyrights in both the artwork and the book. Id. at 1215. The court reasoned that "[b]y borrowing and mounting the preexisting, copyrighted individual art images without the consent of [plaintiff] . . . [defendants] have prepared a derivative work and infringed the subject copyrights." Id.; See also Mirage Editions, Inc. v. Albuquerque A.R.T. Co., 856 F.2d 1341 (1988) is another similar case in which the plaintiffs, who held the rights to various artworks that had been produced by another artist, used the artworks in their book. The defendant bought plaintiffs' book, removed the artwork, mounted the prints onto ceramic tiles, and sold the tiles. The plaintiff subsequently sued the defendant for copyright infringement for using the images without permission. The court found that the defendant had infringed the plaintiffs' copyrights because "[w]hat appellant has clearly done here is to make another version of Nagel's art works and that amounts to preparation of a derivative work." Id. at 1343. The court added, "[b]y borrowing and mounting the preexisting, copyrighted individual art images without the consent of the copyright proprietor, appellant has prepared a derivative work and infringed the subject copyrights." Id.

You have similarly infringed four separate photographs in your book, entitled "Marilyn At Rainbow's End: Sex, Lies, Murder, and the Great Cover-up," published on June 16, 2012, by Blood Moon Productions and distributed by National Book Network and Turnaround Publisher Services. Namely, the infringements consisted of:

- On page 51 of your book: A black and white photograph of the actress Jeanne Carmen. My client's copyright registration has been filed and approved.

- On page 215 of your book: A black and white photograph of Robert Slatzer and Marilyn Monroe. My client's copyright registration has been filed and approved.

- On page 222 of your book: A black and white photograph of Paula Strasberg. This

2

photograph was registered with the U.S. Copyright office in 1990.

- On page 269 of your book: A black and white photograph of Peter Lawford's Beach estate house in Santa Monica. My client's copyright registration has been filed and approved.

True and correct copies of the aforementioned infringements are attached to this letter. As you have failed to seek permission or a license from the owner of copyright in these photographs to use them in your book, the conduct described above constitutes infringement of my client's copyright.

My client desires to resolve this matter amicably and assumes the same from you. Again, at no point in time did my client authorize your use of the photographs listed above. If previous licensing or permission has been given to you for the use of any of the listed photographs, we request that you provide proof of such authorization. The title page of your book, enclosed below, lists Photofest as the licensor of said photographs. Please provide us with licensing documentation from Photofest, or any other licensing agency granting you permission to use my client's photographs.   Otherwise you will be subject to the following.

According to U.S. Copyright Law, my client is entitled to seek an award of statutory damages for all infringements in involved this matter, in a sum up to $30,000 for each infringement. (17 U.S.C. § 504(c)(1).) If a court finds that the infringement was committed willfully, my client is entitled to seek an award of $150,000 for each infringement. (17 U.S.C. § 504(c)(2).)

To rectify this infringement of the aforementioned rights, we require that you:

1.    Immediately cease and desist infringing my client's Copyrights, including, but not limited to, discontinuing any and all publication and sale of the book "Marilyn at Rainbow's End" containing the infringing photos and destroying any such copies of said book; and

2.    Provide my client with $150,000 for the use of her Works to date.

As you will see in the attached jury verdicts, state courts in California and New York have returned verdicts for copyright infringement ranging from $100,000 to $125 Million.  Our client has a very strong case that you intentionally misappropriated her images for use in the book without her permission, and we believe that a jury will find in for her in the higher jury verdicts provided.

You are now on notice as to my client's copyright in respect of the Works described above. If I do not receive an adequate response within 15 days of this letter, I will take any and all such action on behalf of my client in order to protect her rights including, without limitation, legal action for injunctive relief and to recover damages, together with accrued interest and costs. My client otherwise reserves all her rights under the law.

I look forward to hearing from you and promptly resolving this matter.

3

Very Truly Yours,

S. Michael Kernan
[Enclosures]

# MARILYN
# AT RAINBOW'S END

## SEX, LIES, MURDER, AND THE
## GREAT COVER-UP

### by Darwin Porter

Copyright ©2012, Blood Moon Productions, Ltd.
ALL RIGHTS RESERVED
www.BloodMoonProductions.com

Manufactured in the United States of America

ISBN 978-1-936003-29-7

Cover designs by Richard Leeds (Bigwigdesign.com)
Videography and Publicity Trailers by Piotr Kajstura
Special thanks to Photofest in New York City

Distributed in North America and Australia
through National Book Network (www.NBNbooks.com)
and in the UK through Turnaround (www.turnaround-uk.com)

1 2 3 4 5 6 7 8 9 10

stationed outside the door as a guard to prevent anyone from entering Marilyn's room while she and DiMaggio had intercourse. Actually, Carmen would have preferred to stay to watch, or to join in. DiMaggio and Marilyn having sex would offer no surprise for her. She'd seen them in action before, but although Marilyn had orchestrated it, DiMaggio had not been aware of it. Ever since she'd been dating DiMaggio, Marilyn had bragged to Carmen about the athlete's bedroom prowess.

Once, when Carmen was visiting Marilyn for girl talk—"mostly about men, what else?"—they heard DiMaggio's key rattling in the lock. In fear, Marilyn hustled her into the bedroom's closet, because, as she explained, "He'll think



Cover art of Jeanne Carmen's 2006 memoir with
*(inset photo)* portrait photo of Jeanne Carmen

51

on my mother's side."

Between odd jobs, Slatzer became a caddy on a golf course for the likes of Clark Gable, Robert Taylor, and Gary Cooper. "These guys like me a lot—I've even been invited on fishing trips with them"

"I wish they'd invite me along too," she said, "as a mascot."

"Hell, they could use you as bait."

Somewhere along the way, Slatzer secretly dated Jean Peters, the future Mrs. Howard Hughes, who would later co-star with Marilyn in *Niagara*.

"We were only occasional lovers at this point, as Marilyn was seeing a different man every night," Slatzer claimed. "She liked to talk to me, really intimate stuff. She said that she'd saved up and paid for a tube-tying operation. She would later reverse that surgical procedure."

"I did it because I knew having a kid could ruin my career," Marilyn said, according to Slatzer, "Besides, I got tired of all those Back Street butchers. Right before I married Jim, I gave birth to a little girl, but those welfare people came and took her away from me. I was just a kid myself. Hell, at the time, I didn't even know girls as young as I was could even have a child."

Later, she would claim that it was a boy, not a girl, she'd delivered and given up.

She also confessed that while married to Dougherty, she'd once tried to commit suicide. "I turned on the gas in our small kitchen. I might have died had not the mailman arrived to deliver a package for Jim. He smelled gas in the oven and rushed into my kitchen and cut it off. I told him I was just a young bride and didn't know my way around the kitchen. He was tall and handsome, with chestnut brown hair. I felt I owed him something. After all, he saved my life, and I had only one thing to give him."

"Remember that Lana Turner movie, *The Postman Always Rings Twice?*" she asked. "Well, that postman rang more than twice as long as I lived there. He made me realize why I wanted to kill myself. I was not the kind of gal who wanted to face the same old dick every night for the rest of my life. Marriage is such a trap for a woman—it should be against the law."

The influential columnist, Dorothy Kilgallen, learned about Marilyn's affair with Slatzer and wrote about it on August 16, 1952. "A dark horse in the Marilyn Monroe romance derby is Bob



Marilyn Monroe,  Robert Slatzer

215

*from The Life and Curious Death of M. Monroe, © 1976 Robt Slatzer*

During an interview with *Time Out,* Curtis said, "She was a 600-pound gorilla. But she acted like a spoiled six-year-old brat. She told me that I was funnier than Jack Lemmon as Daphne, but she told him she wished she ended up with him and not me at the end of the picture."

Marilyn put on weight during the filming. When she saw the first rushes, she denounced Wilder "for making me look like a fat pig."

One day, she had been scheduled to show up on the set at ten o'clock that morning, but she didn't appear until six o'clock that evening. She looked around the set and didn't see anybody. Wilder had dismissed the crew, since he had to pay them overtime whenever they worked at night. Marilyn shouted to Paula Strasberg, "Where is the fucking Kraut? What in hell am I supposed to do with this shitty role, playing straight man for two drag queens?"

Tempers flared as expenses skyrocketed. On some days, Marilyn didn't show up at all. On other days, she was too drugged or drunk to remember her lines. One piece of dialogue, "Where is that bourbon?" had to be shot fifty-five times.

"I got fucking tired of hearing about her God damn problems," said Wilder. "I didn't give a rat's ass about the dame's fucking problems. I wanted to get the film made. Thank God it was in black and white. A color film would have really run up the budget."

When Marilyn got back to New York, she told Shelley Winters and others, "I hate Hollywood. It's full of big tit blondes trying to look like me. Everybody hates everybody else, but pretends to kiss each other at parties. It doesn't mean a fucking thing. It's all shit! One thing I found out about most actors, producers, and directors out there. All of them, with an exception here and there, have tiny dicks."

\*\*\*

Arthur Miller arrived on the set of *Some Like It Hot,* and a writer there referred to him as "A New York Jew wandering in the Land of Oz."

When he was informed by Wilder of how Marilyn was behaving and delaying production, he chastised her: "How can you show up and not know your lines? And how dare you be late and hold up the crew?"

"You can kiss my ass, Mr. Miller," she said before storming off the set.

As if to make it up to her, Miller, the following day, approached Wilder and asked him, "Would you



Paula Strasberg

223

*appesred n the Marilyn Files By Robt Slatzo*

*and Marilyn The LAST TAKE 1992 By P.H. Brown*

8

them any embarrassment, since he, too, had resumed his affair with Marilyn. Kennedy was the big cheese, so I guess he got first dibs on her. Sinatra didn't want to make a scene. He was known for making scenes, but not with the president."

Sammy Davis, Jr. agreed to escort Marilyn to the luncheon, although it was understood that he'd merely be functioning as a beard. After the luncheon, she disappeared upstairs into one of the bedrooms with the President. He'd developed a passion for bathroom sex.

After long, passionate kisses, he invited her to undress. He did the same before directing her into the bathroom, with its large, claw-footed marble tub.

She thought she was being asked to shower with him, and she was surprised when he wanted her to join him in the bathtub. He preferred to be on his back while she maneuvered herself on top of him for sex.

She was mildly surprised when Lawford came into the bathroom with a camera. JFK showed no shock at all, so she knew this "audition" had been prearranged by both of them.

"I hope it's okay," JFK said, "but I wanted to have Peter take some pictures of us doing it."

"I hope you don't mind, Marilyn," Lawford said.

"It wouldn't be the first time I posed for nude pictures," she said.

"Nor me, either," JFK said.

She wanted to know many more details about when he'd faced the camera nude, but dared not pursue it. She did say, "Mr. President," are you telling me that one day there will be a nude calendar devoted just to you?"

"All things are possible," he said.

Marilyn later told Jeanne Carmen what took place that afternoon: When they emerged from the bathtub and dried off, Lawford wanted to take frontal nudes of them while they were passionately kissing. At one point, JFK asked her to perform fellatio on him, so that Lawford could snap a picture of them together.

According to what Marilyn told Carmen, Lawford later asked if he could join them in bed. "But only in a service capacity," JFK told his brother-in-law.

She claimed she knew what that meant. "Peter, as you know, has quite a gay



Peter and Patricia Lawford's house in Santa Monica

*Photo has only appeared in The Marilyn files by Robert Slatzer*

269

# NY Jury Verdicts

2008 WL 4792871 (S.D.N.Y.) (Verdict and Settlement Summary)

Copyright (c) 2012 ALM Media Properties, LLC. All Rights Reserved
United States District Court, S.D. New York.

The Authors Guild, Associational Plaintiff, Herbert Mitgang, Betty Miles and Daniel Hoffman, Individually And On Behalf Of All Others Similarly Situated v. Google Inc.

No. 05 CV 8136
DATE OF VERDICT/SETTLEMENT: October 28, 2008
TOPIC: INTELLECTUAL PROPERTY - COPYRIGHTS - CIVIL PRACTICE - CLASS ACTION

Class Alleged Google's Online Books Not Authorized

**SUMMARY:**
RESULT: Settlement

The parties agreed to a settlement, pursuant to which Google will make payments totaling $125 million.

The author sub-class will receive 63 percent of the revenues earned from Google's sale of subscriptions to the electronic books database, sale of online access to books, advertising revenues and other commercial uses. Google will also pay the author sub-class $34.5 million to establish and maintain a Book Rights Registry, to collect revenues from Google and distribute those revenues to copyright owners, and it will pay $45 million to copyright owners whose works it has digitized without permission as of May 5, 2009. The copyright owners also have the right to determine whether and to what extent Google may use their works. Class counsel for the author sub-class will receive $30 million for attorneys' fees and costs, subject to court approval.

**EXPERT WITNESSES:**
**ATTORNEYS:**
Plaintiff: Michael J. Boni; Boni & Zack LLC; Bala Cynwyd, PA (Authors Guild Inc.); Joanne Zack; Boni & Zack LLC; Bala Cynwyd, PA (Authors Guild Inc.); Joshua Snyder; Boni & Zack; Bala Cynwyd, PA (Authors Guild Inc.); Jeffrey P. Cunard; Debevoise & Plimpton LLP; New York, NY (Association of American Publishers Inc.); Bruce P. Keller; Debevoise & Plimpton LLP; New York, NY (Association of American Publishers Inc.); James J. Pastore; Debevoise & Plimpton LLP; New York, NY (Association of American Publishers Inc., Authors Guild Inc.)
Defendant: Daralyn J. Durie; Keker & Van Nest; San Francisco, CA (Google Inc.); David J. Silbert; Keker & Van Nest; San Francisco, CA (Google Inc.); Joseph C. Gratz; Keker & Van Nest; San Francisco, CA (Google Inc.)

JUDGE: John Sprizzo

RANGE AMOUNT: $100,000 – 125,000,000

STATE: New York
COUNTY: Not Applicable

**INJURIES: The class sought compensation for the alleged copyright violations.**

**Facts:**
The plaintiff class members consist of all persons and their heirs, successors and assigns who, as of Jan. 5, 2009, own a U.S. copyright interest in one or mores books or inserts that was digitized and displayed in the Google Library Project without the copyright owner's permission. The class is a worldwide class and consists of two sub-classes: an author sub-class and a publisher sub-class.

Google entered into agreements with several libraries to digitize books and other writings in those libraries' collections, and it has digitized more than 7 million books, millions of which are still copyrighted in the United States. Google users can search Google's digital library and view short excerpts from the digitized books.

The class sued Google, alleging copyright infringement based on digitizing the books, creating an electronic database of the books, and displaying short excerpts of the books without the copright owners' permission.

The defense denied the allegations.

The defense denied that the class was entitled to compensation.

The publisher sub-class settled with Google for $15.5 million.

ALM Properties, Inc.
U.S. District Court, Southern District

PUBLISHED IN: VerdictSearch New York Reporter Vol. 26, Issue 22

2004 WL 6042560 (E.D.N.Y.) (Verdict and Settlement Summary)

Copyright (c) 2012 Thomson Reuters/West
WEST'S JURY VERDICTS - NEW YORK REPORTS
$490K for Record Company's Infringement on Copyright
United States District Court, E.D. New York.

BMG Music v. Montes Records

**Type of Case:**
Intellectual Property • Copyright

**Specific Liability:** Record companies infringed upon the copyrights held by other music companies

**General Injury:** Monetary damage; injunctive relief

**Jurisdiction:**
State: New York
County: Not Applicable

**Related Court Documents:**
Complaint for copyright infringement: 2006 WL 1787847

Judgment: 2004 WL 6026429

Case Name: BMG Music, *et al* v. Montes Record Inc., *et al*

**Docket/File Number:** 1:03-cv-02693

**Judgment: Plaintiffs, $490,000.00**

**Judgment Range:** $100,000 – 125,000,000
                                    **Judgment Date:** Oct. 6, 2004
**Judge:** Nicholas G. Garaufis
**Attorneys:**
Plaintiffs: Harvey Shapiro, Sargoy Stein Rosen & Shapiro, New York, N.Y.; Karen Stetson, Broad and Cassel, Miami, Fla.
Defendants: None mentioned

**Trial Type: Bench**
**Breakdown of Award:**

**$490,000.00 to plaintiffs for statutory damages**

**Summary of Facts:**
BMG Music, Elektra Entertainment Group Inc., London-Sire Records Inc., Sony Music Entertainment Inc., UMG Recordings Inc., Warner Bros. Records Inc., and Warner Music Latina Inc. (Copyright Owners) reportedly registered several phonorecords with the United States Copyright Office. Montes Records Inc., doing business as Montes Records, also known as Dania Records, together with the owners Gustavo Nocelo and Carmelo Gonzalez allegedly sold copies of the aforementioned phonorecords without the permission of the Copyright Owners. The Copyright Owners apparently employed investigators to observe Montes Records, Nocelo, and Gonzalez's conduct. The Copyright Owners allegedly sent written requests to Montes Records, Nocelo, and Gonzalez to cease sales of the copyrighted phonorecords. They, however, reportedly did not respond to the requests.

BMG Music, Elektra Entertainment Group, London-Sire Records, Sony Music Entertainment, UMG Recordings, Warner Bros. Records, and Warner Music Latina filed a lawsuit against Montes Records, doing business as Montes Records, also known as Dania Records, Nocelo, and Gonzalez in the United States District Court for the Eastern District of New York. In the complaint for copyright infringement, the plaintiffs claimed the defendants conduct was direct infringement of the plaintiffs' registered copyright under the Copyright Act of the United States. They also alleged contributory copyright infringement.

The plaintiffs sought statutory damages, preliminary and permanent injunctions, and attorney fees.

# CA Jury Verdicts

28 Trials Digest 3d 7, 1000 WL 34640 (C.D.Cal.) (Verdict and Settlement Summary)

Copyright (c) 2012 Thomson Reuters/West
United States District Court, C.D. California, Western Division.

Guthy-Renker Corporation vs. Bernstein

**TOPIC:**
Synopsis: Photographs are allegedly used in infomercial campaign without appropriate photo credit

Case Type: Intellectual Property; Copyright; Contracts; License

DOCKET NUMBER: 979279

STATE: California
COUNTY: Not Applicable
                              No Date Given
JUDGE: Mariana R. Pfaelzer
**ATTORNEYS:**
Plaintiff: Daniel M. Cislo, Cislo & Thomas, Santa Monica.; Ben D. Whitwell, Belin, Rawlings & Badal, Los Angeles.
Defendant: MyKhanh P. Shelton, Quinn, Emanuel, Urquhart, Oliver & Hedges, Los Angeles.; Samuel B. Shepherd, Quinn, Emanuel, Urquhart, Oliver & Hedges, Los Angeles.

**SUMMARY:**
Verdict/Judgment: Cross Complainant

Verdict/Judgment Amount: $146,536

Range: $100,000-$125,000,000

Awarded as general damages on the counterclaim.

Trial Type: Bench

Trial Length: 5 days.

**EXPERTS:**
Plaintiff: Not reported.
Defendant: Jane Kinne, photographic consultant, Russ Kinne Inc., New Canaan, CT, (203) 966-4900.; Albert Rossi, certified public accountant, Rossi, Finkelstein & Company, Long Beach,

(562) 495-3325.

**TEXT:**

**CASE INFORMATION**

**FACTS/CONTENTIONS**

According to Defendant: Defendants/counterclaimants claimed that the use of two photographs of Victoria Principal in the marketing and sale of the Principal Secret cosmetics line constituted copyright infringement and breach of contract. The plaintiff/counterdefendant was Guthy-Renker Corporation (GRC). The defendant/counterclaimants were Gary Bernstein, a photographer; Gary Bernstein Photography; and Gary Bernstein Studio Productions.

Defendants/counterclaimants alleged that GRC violated the express terms of its license agreement with defendants/counterclaimants and thereby committed copyright infringement by using a photograph of Victoria Principal (referred to as Photograph 1) in GRC's Principal Secret infomercial campaign without giving Bernstein the appropriate photo credit called for in the license agreement. In addition, GRC misappropriated another Bernstein photograph of Victoria Principal (referred to as Photograph 2) and infringed Bernstein's copyright in a myriad of ways--from using the photograph in infomercials to reproducing the photograph in catalogues and advertisements to placing the photograph on GRC's website. GRC's use of Photograph 2 was so extensive and so emphasized in GRC's marketing campaign that the photograph was positioned by GRC as a brand logo for the Principal Secret line in which GRC engendered substantial and valuable goodwill.

As a result of GRC's copyright infringement and breach of contract, Bernstein alleged entitlement to actual damages and GRC's profits attributable to the infringing uses, including the goodwill that GRC obtained in Photograph 2. In addition, Bernstein was entitled to enhanced statutory damages under the Copyright Act with respect to GRC's willful infringed uses of Photograph 2.

**CLAIMED INJURIES**

NA

**CLAIMED DAMAGES**

According to Defendant: Actual damages and profits, including goodwill; enhanced statutory damages.

**SETTLEMENT DISCUSSIONS**

According to Defendant: Demand on counterclaim: Not reported. Offer on counterclaim: $40,000 increased to $80,000 (FRCP 68).

**COMMENTS**

According to Defendant: Defendants/counterclaimants have filed a notice of appeal. Defense counsel reported that the date of entry of judgment is disputed by the parties.

Trials Digest, A Thomson/West business
Central District Federal Court/Los Angeles

2008 WL 4925711 (E.D.Cal.) (Verdict and Settlement Summary)

Copyright (c) 2012 ALM Media Properties, LLC. All Rights Reserved
United States District Court, E.D. California.

Pat Kelley v. Crate & Barrel

No. CV-07-0232 JAM
DATE OF VERDICT/SETTLEMENT: July 25, 2008
TOPIC: INTELLECTUAL PROPERTY - COPYRIGHTS - INTELLECTUAL PROPERTY – INFRINGEMENT

Artist Said Houseware Company Infringed on Her Digital Images

**SUMMARY:**
RESULT: Settlement

Kelley accepted Crate & Barrel's Rule 68 Offer for $150,000.

**EXPERT WITNESSES:**
**ATTORNEYS:**
Plaintiff: Scott A. Burroughs; Doniger Law Firm; Culver City, CA (Pat Kelley)
Defendant: Bart Lazar; Seyfarth Shaw, L.L.P.; Chicago, IL (Crate & Barrel)
JUDGE: John A. Mendez

RANGE AMOUNT: $100,000 – 125,000,000

STATE: California
COUNTY: Not Applicable

**INJURIES: Kelley sought unspecified damages to recover the profits reaped from the unauthorized commercial use of her images.**

**Facts:**
In December 2006, plaintiff Pat Kelley, an artist, discovered that Crate & Barrel was using what looked like her art images in commercial products. She had not been informed of this use or authorized it.

Kelley maintains a Web site where she displays her unique artwork and the relevant copyright notices.

Kelley sued Crate & Barrel for copyright infringement, claiming that company designers downloaded several of pieces from her Web site, and then used them on lines of wrapping paper,

gift cards, ribbons and other items. Kelley further claimed that these items were then put on sale to the public without her knowledge or consent.

The defense claimed that a rogue designer hired by Crate & Barrel had used the designs without the company's knowledge.

ALM Properties, Inc.
United States District Court, E.D. California, at San Diego

PUBLISHED IN: VerdictSearch California Reporter Vol. 7, Issue 47

2008 WL 5991092 (C.D.Cal.) (Verdict and Settlement Summary)

Copyright (c) 2012 ALM Media Properties, LLC. All Rights Reserved
United States District Court, C.D. California, Western Division.

Gregory Scott Del Amo v. No Cash Inc. and Norman Baccash

No. CV-07-663-PSG-JWFx
DATE OF VERDICT/SETTLEMENT: August 13, 2008
TOPIC: INTELLECTUAL PROPERTY - COPYRIGHTS - INTELLECTUAL PROPERTY - COPYRIGHT ACT - STATE STATUTES

Web Site Used Photos Without His Consent, Photographer Said

**SUMMARY:**
RESULT: Decision-Plaintiff

The court entered judgment in favor of Del Amo.

Under Civil Code § 3344, the court awarded Del Amo statutory damages for misappropriation of the models' likenesses embodied in his original photographs and attorney fees.

**EXPERT WITNESSES:**
**ATTORNEYS:**
Plaintiff: Timothy D. Reuben; Reuben, Raucher & Blum; Los Angeles, CA (Gregory Scott Del Amo); Gregory P. Barchie; Reuben, Raucher & Blum; Los Angeles, CA (Gregory Scott Del Amo)
Defendant: Christopher Q. Pham; Johnson & Pham, LLP; Woodland Hills, CA (No Cash Inc., Norman Baccash)
JUDGE: Philip S. Gutierrez

RANGE AMOUNT: $100,000 – 125,000,000

STATE: California
COUNTY: Not Applicable

**INJURIES: Del Amo sought actual damages under federal and state law, including copyright infringement and misappropriation of one's likeness pursuant to Cal. Civil Code § 3344 on behalf of the models featured in his photographs.**

**Facts:**
Plaintiff Gregory Scott Del Amo, a photographer, owned all the intellectual property rights to his original photographs.

Del Amo entered into a written agreement with the models featured in his photographs and was assigned and granted "all existing right of every kind and character" in his original works.

In addition to copyrights, these contractual rights also granted him the right to use -- and to license others to use -- the models' names, likenesses and any other elements of the model's performance embodied in his original works for the purposes of commercial advertising or publicity, including endorsements.

Del Amo claimed that No Cash Inc. and Norman Baccash owned a commercial Web site that displayed 14 of his photographs in order to market their online services.

He sued No Cash and Baccash.

Del Amo claimed that No Cash and Baccash displayed his photographs without his consent. Del Amo contended that his agreements with the models were sufficiently broad to convey and assign the models' publicity rights under California Civil Code § 3344 for the purposes of advertising and exploiting any work embodying the models' performances.

Del Amo also contended that he had standing to assert a claim for misappropriation of the models' likenesses under Civil Code § 3344. In addition, Del Amo contended that his § 3344 claims did not interfere with the exclusive rights granted by the Copyright Act, and in fact, protected rights entirely separate from copyright, and therefore the state claim was not preempted.

Del Amo sought statutory damages and attorney fees for the defendants' alleged wrongful conduct pursuant to Civil Code § 3344 because Del Amo did not register his original photographs with the U.S. Copyright Office prior to his claim of the defendants' infringement.

The court also awarded Del Amo injunctive relief pursuant to the Copyright Act and § 3344.


ALM Properties, Inc.
United States District Court, C.D. California, at Los Angeles

PUBLISHED IN: VerdictSearch California Reporter Vol. 8, Issue 21

# Exhibit "B"

From: **deborah thompson** <sweetsuits@gmail.com>
Date: Thu, Nov 15, 2012 at 6:53 PM
Subject: COPYRIGHT INFRINGEMENT
To: MCornell@nbnbooks.com

DEAR MR CORNELL:

IN THE BOOK TITLED; MARILYN AT RAINBOWS END, BY DARWIN PORTER, (ISBN 978-1-936003-29-7), THE PHOTOGRAPH ON PAGE 223, OF PAULA STRASBERG, IS COPYRIGHTED (#VAU000201097) , (#V3586D934), BY THE ESTATE OF ROBERT F. SLATZER, AND IS BEING USED WITHOUT AUTHORIZATION FROM THE ESTATE..

IMMEDIATELY CEASE AND DESIST FROM USING SAME. ALSO PLEASE PROVIDE NAME OF COUNSEL, AS I WOULD LIKE TO KNOW HOW MANY COPIES HAVE BEEN DISSEMINATED.

SINCERELY,

MRS. DEBORAH SLATZER


CC; C. PERSONS N.Y.